CANADY, J.,
dissenting.
The circuit court properly ruled that the appellants failed to establish any basis for requiring the Legislature to further revise Florida’s congressional district map. The majority’s decision to reverse the circuit court and to invalidate numerous districts in the remedial congressional district plan adopted by the Legislature involves an extreme distortion of the appellate process deployed to effect a serious violation of the separation of powers. Accordingly, I dissent.
I.
The linchpin of the majority’s decision is the assertion that in the final judgment the trial court “concluded that the [congressional redistricting] plan was drawn with improper partisan intent” and that the improper intent affected the entire plan. Majority op. at 386. According to the majority, “the trial court failed to give any actual effect to its finding in this case that the ‘whole plan’ challenge had been proven through the direct and circumstantial evidence of improper partisan intent presented at trial.” Majority op. at 396. In fact, however, the final judgment — a copy of which is appended — contains no finding whatsoever that the Legislature acted with improper intent regarding the entire congressional plan or that the “whole plan” challenge had been proven. The majority fails to identify any such finding in the final judgment. Instead, the majority puts forth a misconstruction of the trial court’s ruling based on fragments from the final judgment taken out of context and creatively cobbled together. The trial court refused to draw an inference from the evidence that an improper partisan intent affected the redistricting plan in its entirety. But the majority effectively steps into the role of the trier of fact, independently reweighs the evidence; finds that the evidence supports the inference that the whole plan was affected by an improper partisan intent, imputes that broad finding of unconstitutional intent to the trial court, and then .faults the trial court for not acting in accord with that fabricated finding. The upshot is a virtually revolutionary deformation of the appellate process.
The materials from which the majority fashions its misconstruction of the trial *418 court’s ruling are found largely in the trial court’s findings regarding a “conspiracy” by certain Republican political consultants “to influence and manipulate the Legislature into a violation of its constitutional duty.” Final Judgment at 10. But those materials are misshaped by the majority. When the trial court’s ruling is considered in its full context, three essential points are clear in the trial court’s findings regarding the consultants’ conspiracy.
First, the consultants “managed to taint the redistricting process and the resulting map with improper partisan intent” by finding “ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration to ensure that their plan was realized, at least in part.” Final Judgment at 22 (emphasis added). The trial court unquestionably determined that efforts of the consultants to cause partisan action by the Legislature had some success.
Second, the consultants’ conspiracy was not successful in affecting the entire map drawing process. The “taint” of “improper partisan intent” attributable to the activities of the Republican consultants was limited in scope and effect. This is evident from the trial court’s crucial finding that “the staff members who did the bulk of the actual map drawing for the Legislature ... were not a part of the conspiracy, nor directly aware of it, and that significant efforts were made by them and their bosses to insulate them from direct partisan influence.” Final Judgment at 22. The trial court specifically found that the committee staff “were insulated from the political consultants,” Final Judgment at 37, and that the “motivation [of the staff] in drawing draft maps for consideration of the Legislature was to produce a final map which would comply with all the requirements of the Fair Districts Amendments, as their superiors had directed them.” Final Judgment at 22. This finding is of critical importance because of the pivotal role the committee staff indisputably had in drawing the districts the trial court refused to invalidate.
Third, the trial court found that an improper partisan intent did affect certain districts in the redistricting plan — namely, Districts 5 and 10 — where there was evidence that the configuration of the districts was influenced through contact between the Republican consultants and legislative leadership or leadership staff. Thus, based on its consideration of the evidence, the trial court decided that “collaboration and cooperation” between the partisan consultants and decision makers in the Legislature regarding particular districts was the predicate for requiring the redrawing of a district based on a finding of unconstitutional intent.
The majority simply ignores the second of these points and fabricates a broad finding of unconstitutional intent. The majority goes on to fault the trial court for failing “to give any independent legal significance to its finding of unconstitutional intent when examining the challenges to individual districts,” majority op. at 398, and to assert that the trial court essentially concluded that some improper intent is acceptable. See majority op. at 393-94. Neither criticism of the trial court’s order can withstand analysis. The trial court cannot be faulted for failing to give independent significance to a factual finding it did not make. The trial court expressly considered the question of unconstitutional intent in its analysis of the challenged individual districts. Indeed, the trial court was intently focused on the factual question of whether improper intent affected the drawing of particular districts by the Legislature. With respect to two districts, the trial court found that the districts were drawn with unconstitutional intent in the *419 map initially adopted. With respect to the other districts, the trial court found that the appellants had failed to establish that the districts were drawn with unconstitutional intent.
At no point does the trial court indicate that it would permit some level of unconstitutional intent in the drawing of any district. The assertion to the contrary is unwarranted. As the final judgment makes plain, the trial court thoughtfully considered the evidence in determining the extent to which the “secretive shadow process of map drawing by the political consultants” was in fact successful in causing the Legislature to act with unconstitutional intent in the drawing of particular districts. Final Judgment at 11-12. In rejecting the “whole plan” challenge, the trial court recognized the unremarkable proposition that districts that were not drawn with an unconstitutional intent and that did not otherwise violate the constitutional standards should not be invalidated. The trial court’s ruling on this point is in accord with the basic principle “that the scope of the constitutional violation measures the scope of the remedy.” Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 455, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).
■Although the trial court made no finding of a “general intent” by the Legislature to favor a political party or incumbents, the court reasoned that “even if’ such a general intent could be proven it would be insufficient to invalidate a particular district unless it was shown that the improper intent affected the drawing of that district. Attempting to match the scope of the remedy to the scope of the violation, the trial court correctly focused on the “effect of ... noncompliance” with the Constitution in determining whether districts should be invalidated. Final Judgment at 9.
The majority asserts that “the trial court considered a general improper intent to lack any independent legal significance unless it was accompanied by another constitutional violation.” Majority op. at 394. But the trial court’s analysis makes clear that it was focused on whether any general improper intent actually affected the drawing of particular districts — not on whether particular districts were affected by the violation of other standards.
The majority’s reading of the text of the final judgment on this point imports incoherence into the final judgment. It puts the reference to “general intent” in conflict with the trial court’s reiterated conclusion that the districts now invalidated by the majority were not drawn with improper intent. But the text of the final judgment — like any other text — should be read harmoniously. The rule that “the provisions of a text should be interpreted in a way that renders them compatible, not contradictory” is a compelling rule of construction predicated on the reality that “it is invariably true that intelligent drafters .do not contradict themselves.” Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts .180 (2012). There is no basis for concluding here that the trial court engaged in self-contradiction.
II.
The invalidation of Districts 5,13,14, 21, 22, 25, 26, and 27 cannot be reconciled with crucial factual determinations made by the trial court. Indeed, the invalidation of these districts can only be accomplished by setting aside the trial court’s rulings regarding not only improper intent but also compactness, retrogression and other constitutional standards. The invalidation of these districts flies in the face of the pivotal role of the committee .staff in drawing them and the trial court’s express finding that the committee staff were insulated from partisan influence. The trial court’s *420 rulings regarding improper intent and retrogression, in particular, indisputably turn on the question of fact that can only properly be determined by the trier of fact.
In an opinion teeming with judicial overreaching, the invalidation of Remedial District 5 has pride of place. The basis for the majority’s decision to require that this district be reoriented from its north-south configuration to an east-west configuration ultimately boils down to this: the north-south configuration must be rejected because that is the configuration chosen by the Legislature and the Legislature’s choice is presumed to be unconstitutional. If the Legislature made a choice, we must begin by assuming the choice violated the constitution. This is so even though the configuration chosen by the Legislature was based on a map drawn by committee staff, who were insulated from partisan influence in selecting that configuration. The majority also suggests that the north-south configuration is somehow tainted because “the long-time incumbent of the district, Congresswoman Corrine Brown ... previously joined the leading Republicans in actively opposing the Fair Districts Amendment and redistricting reform.” Majority op. at 403.
Based on this supposed taint and the presumption of unconstitutionality, the majority treats as irrelevant the trial court’s ruling that “the Plaintiffs have not offered convincing evidence that an East-West configuration is necessary in order to comply with tier-one and tier-two requirements of Article III, section 20.” Order Approving Remedial Redist. Plan at 3. Under the majority’s application of the presumption of unconstitutionality, an alternative suggested by the challengers is virtually guaranteed to trump any choice made by the Legislature. This vividly illustrates just how far the majority has gone in repudiating the principle that a redistricting plan should not be declared unconstitutional “unless it clearly appears beyond all reasonable doubt that, under any rational view that may be taken of the [plan], it is in positive conflict with some identified or designated provision of constitutional law.” In re Apportionment Law, 263 So.2d 797, 805-06 (Fla.1972) (quoting City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. 769, 772 (1914)).
The majority fails to consider critical aspects of the alternative suggested by the challengers for Remedial District 5. Most strikingly, the majority ignores the reality that the mandated east-west configuration will result in a district that is significantly less compact than Remedial District 5. In addition, no attention is given to the fact that the creation of the Easb-West District will cause adjoining District 2 to become significantly less compact.
Remedial Plan Map
*421 [[Image here]]
As the Legislature points out, the East-West District’s length will be 43% greater than the length of Remedial District 5— 206 miles rather than 144 miles. The perimeter of the East-West District is 22% larger than Remedial District 5’s perimeter, and the area of the East-West District is 93% greater than the area of Remedial District 5. By any reasonable understanding of compactness, this is a dramatic movement toward a less compact district.
RD 5 E-W D Change
Length (miles) 144 206 +43%
Perimeter (miles) 583 711 +22%
Area (square miles) 2031 3,911 +93%
*422 The redrawing of District 2 necessitated by the majority’s decision that Remedial District 5 must be replaced by an East-West District will also result in a dramatic movement toward a less compact district. The length of District 2 will be increased by 39% from 167 miles to 282 miles. The district’s perimeter will increase by 75% and its area by 30%.
_ D2_New D2 Change
Length (miles)167_232 +39%
Perimeter (miles) 550 961 + 75%
Area (square miles) 10,107 13,107 +30%
The majority’s imposition of the East-West District is also predicated on a disregard of the evidence of the potential for retrogression in the East-West District, and the failure to establish any objective standard for prohibited retrogression. On the issue of retrogression, the majority dismisses the expert testimony presented by the Legislature and acts on the basis of a very simple and totally subjective rule: we know retrogression when we see it. The majority’s approach regarding the other challenged districts where retrogression was at issue parallels its approach regarding Remedial District 5.
With the invalidation of Remedial District 5 and other challenged districts, the ironic result is that districts drawn by professional committee staff, who were insulated from partisan influence in the drawing of the districts, are effectively displaced by districts drawn — as evidenced by deposition testimony — under the auspices of the National Democratic Redistricting Trust in cooperation with the Democratic Congressional Campaign Committee. There is something dreadfully wrong with this picture. As the Legislature argues: “To discard the work product of the Florida Legislature, which the trial court carefully considered and upheld, and substitute the partisan handiwork of the DCCC and the Democratic Trust, would be an indelible stain.” Legislative Parties’ Answer Brief at 91.
III.
Despite casting its disagreement with the trial court in terms of legal errors, the majority’s real disagreement with the trial court is not about questions of law. It is about questions of fact. The majority thus reverses the trial court because the trial court failed to invalidate particular districts for being drawn with an unconstitutional intent when the trial court made the factual determination that those districts were not drawn with an unconstitutional intent. The majority’s real problem with the trial court’s ruling is that the trial court was unwilling to draw broad factual inferences concerning intent that the majority concludes should have been drawn.
Intent unquestionably is a question of fact. As we explained in Jersey Palm-Gross, Inc. v. Paper, 658 So.2d 531 (Fla.1995), “the ultimate arbiter on the issue of intent is the trial court because ‘the question of intent is one of fact.’ ” Id. at 534 (quoting Rebman v. Flagship First Nat’l Bank, 472 So.2d 1360, 1364 (Fla. 2d DCA 1985)).
It is axiomatic that determining whether a district should be invalidated based on an unconstitutional intent claim turns on the factual question of'whether that district was drawn with an unconstitutional intent — a question indisputably within the *423 province of the trier of fact. By imposing its own judgment about the factual inferences to be drawn from the evidence at trial, the majority has transgressed the boundaries of proper appellate review and invaded the province of the trier of fact. Such overreaching by an appellate court would be a grave matter in any context, but it is doubly grave in the context of redistricting litigation, where a coordinate branch of government is a party and the constitutional authority of that branch is at issue. In a context such as this, the court has a special duty to scrupulously observe the limitations inherent in its function as an appellate court. Unfortunately, the majority has heedlessly cast those limitations aside.
The majority effectively holds that a finding of any unconstitutional intent in the drawing of congressional districts causes a presumption to arise that all the districts in the plan were drawn with an unconstitutional intent. Based on that presumption, the majority places the burden of proof on the Legislature to establish that particular districts were not drawn with an unconstitutional intent. The majority thus creates a general presumption of unconstitutionality based on a specific, narrow constitutional violation. This broad presumption of uncoftstitution-ality untethers the remedy for violating the Constitution from proven specific violations requiring specific remedies. It transgresses the self-evident principle that “the scope of the constitutional violation measures' the scope of the remedy.” Penick, 443 U.S. at 455, 99 S.Ct. 2941. This, needless to say, shatters the shell of the presumption of constitutionality that was left by this court’s recent redistricting decisions. But the majority reaches even further.
IV.
Having invaded the province of the trier of fact to find the factual basis for triggering the newly created presumption of unconstitutionality, the majority continues its march to dominate the redistricting process and finishes the job — at least for now — by making the factual determinations that the Legislature did not prove a lack of improper intent in the drawing of the specifically challenged districts. Marching forward, the majority eviscerates numerous factual determinations made by the trial court in its evaluation of the individual district challenges.
Under the well-established framework for appellate review, if an appellate court determines that the trier of fact has placed the burden of proof on the wrong party, the case should be remanded to the trier of fact to reevaluate the evidence in light of the correct legal rule regarding the burden of proof. The weighing of the evidence under the applicable burden of proof is the function of the trier of fact. That function should not be usurped by an appellate court. The Supreme Court has recognized as “elementary” that “ ‘fact finding is the basic responsibility of [trial] courts, rather than appellate courts’” and “where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue.” Pullman-Standard v. Swint, 456 U.S. 273, 291-92, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (quoting DeMarco v. United States, 415 U.S. 449, 450 n., 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974)). Proceedings by an appellate court contrary to these elementary principles are “incredible.” Id. at 293, 102 S.Ct. 1781.
The majority caps off its abandonment of the restraints of the appellate process by retaining jurisdiction after deciding this case, dictating the details of the proceedings in the trial court, and presuming to *424 require that all filings submitted in the trial court shall “simultaneously be submitted to this court.” This retention of jurisdiction and exercise of control of the proceedings in the trial court further vividly demonstrates the majority’s aggressive determination to exercise full dominion over the redistricting process. Unlike our review of the legislative redistricting plan— over which we have original review jurisdiction under article III, section 16 — -our review of this case involving congressional redistricting is based on our jurisdiction to review trial court judgments that are certified by a district court under article V, section 3(b)(5). Once we have decided this case, there is no reason — other than the majority’s determination to guarantee that it has the last word — that the case should not proceed like any other case that is reversed and remanded to a trial court after we have exercised our jurisdiction over a trial court judgment certified to us by a district court. If a party believes that an error occurs in the proceedings on remand, that party may file an appeal in the district court. The district court can then either decide the case or certify it to this court for decision. That is the way such cases proceed in the ordinary course. But here the ordinary course of judicial proceeding is once again cast aside by the majority without a shred of justification.
Y.
The damage done by this decision to the structure of the appellate process is exceeded only by the damage done to the constitutional separation of powers. Injury to the separation of powers in this case takes two forms. First, the majority effectively supplants the substantive constitutional power of the Legislature to draw congressional districts. As I have explained, the majority does this by reviewing the redistricting plan in a way that is inconsistent in multiple ways with the proper exercise of judicial power. Second, the majority invades the internal workings of the Legislature by effectively dictating how the Legislature must conduct its business in connection with the adoption of the revised congressional redistricting plan that the majority has mandated. The majority thus sets forth certain “guidelines and parameters” concerning the process for adopting a revised congressional district map. None of these “guidelines and parameters” have any basis in law. All of the subjects addressed by the “guidelines and parameters” are covered by existing law, but the majority imposes requirements that indisputably go beyond the clear requirements of the governing law.
The majority’s “guidelines and parameters” for the conduct of legislative business run headlong into our prior recognition of the danger “that the control or influence by one branch of another branch’s internal operating procedures could interfere with the independence of the second branch and possibly place the enforcing branch in a superior position.” Locke v. Hawkes, 595 So.2d 32, 36 (Fla.1992). Short shrift is given to the rule that “[i]t is a legislative prerogative to make, interpret and enforce its own procedural rules and the judiciary cannot compel the legislature to exercise a purely legislative prerogative.” Moffitt v. Willis, 459 So.2d 1018, 1022 (Fla.1984). In all the annals of constitutional government, this Court’s aggressive invasion of the internal workings of the legislative branch is without precedent. The only case authority that can be cited to support the depredations here visited on the independence of the legislative branch is this Court’s recent aberrant decision requiring members of the Legislature to submit to interrogations concerning their legislative activities. But the invasion of the legislative sphere made by the Court’s prior ruling is outstripped by today’s ruling.
*425 In attempting to justify these unprecedented incursions into the constitutional sphere of the Legislature, the majority offers the singularly unconvincing reason that “a redistricting plan enacted by the Legislature is ... unique as compared to other types of legislation, in that it inr volves a specific ‘constitutional restraint on the Legislature’s actions.’ ” Majority op. at 414. This is fallacious. In every single case challenging the constitutionality of a law the question at issue is whether the law transgresses a constitutional restraint on the Legislature. There is nothing “unique” about the challenge brought in this case that justifies transgressing the separation of powers. It is “unique” only because the majority has chosen to treat it as “unique” to justify a “unique” exercise-of judicial power.
All of the “parameters and guidelines” constitute unwarranted interference with the operation of the Legislature within its own constitutional sphere. The most egregious of the “safeguards” set forth by the majority is the admonition that “the Legislature should provide a mechanism for the challengers and others to submit alternative maps and any testimony regarding those maps for consideration and should allow debate on the merits of the alternative maps” and should “offer an opportunity for citizens to review and offer feedback regarding any proposed legislative map before the map is finalized.” Majority op. at 415. This tramples on the institutional independence and integrity of the Legislature by inserting the challengers and others outside the Legislature into the very heart of the legislative process.
The challengers and others interested in redistricting have the benefit, of course, of the constitutional right granted to the people of Florida “to petition for redress of grievances.” Art. I, § 5, Fla. Const. They thus have the right to communicate with members of the Legislature to make their views known and to criticize legislative proposals. But the majority opinion clearly contemplates a “mechanism” that goes far beyond permitting the exercise of this constitutional right. The Legislature debates and gives formal consideration only to proposals that are submitted — in the form of bills or resolutions and amendments thereto — by members of the Legislature. The filing of bills, resolutions and amendments in the Legislature is the exclusive constitutional prerogative of elected members of the Legislature. And no person who is not a member of the Legislature has standing in the Legislature to participate in legislative , debate, submit proposals that must be debated or to formally “review” proposals under consideration by the Legislature before they are adopted. In ignoring these elemental features of the legislative process, the majority betrays either a lack of knowledge or a lack of regard for the integrity of the core function of a coordinate branch of government.
VI.
This decision causes serious damage to our constitutional structure. The proper functioning of the judicial process is deformed and the separation of powers is breached in an unprecedented manner. Since 2012, this Court’s decisions concerning the redistricting process have been characterized by a repeated rewriting of the rules. The foundation for all that followed was the effective abrogation of our precedents that clothed a redistricting plan with a presumption of constitutionality. The Fair Districts Amendments — which said not a word about the alteration of the exercise of judicial power — could not bear the weight of that jettisoning of the presumption of constitutionality. And the Fair Districts Amendments certainly cannot bear the weight of today’s decision, *426 which abandons ' the well-established boundary between the trier of fact and a reviewing appellate court and transgresses the independence of the core function of the legislative branch in' conducting the legislative process. I dissent.
POLSTON, J., concurs.
Appendix
IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA
RENE ROMO, et al, Plaintiffs,
vs.
KEN DETZNER and' PAM BONDI, Defendants.
THE LEAGUE OF WOMEN VOTERS OF FLORIDA, et al, Plaintiffs,
vs.
KEN DETZNER, et al, Defendants.
CASE NO: 2012-CA-412
CASE NO: 2012-CA-490

FINAL JUDGMENT

This case is before me following a lengthy bench trial. Plaintiffs claim that the congressional redistricting plan adopted by the Legislature violates Article III, Section 20 of the Florida Constitution. For the reasons set forth below, I agree, finding that districts 5 and 10 were drawn in contravention of the constitutional mandates of Article III, Section 20, thus making the redistricting map unconstitutional as drawn.
INTRODUCTION
President George Washington, in his farewell address of 1796, warned the new nation of the dangers of political parties.
“However combinations or associations of the above description may now and then answer popular ends, they are likely in the course of time arid things, to become potent engines, by which cunning, ambitious, and unprincipled men will be enabled to subvert the power of the people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion.... Without looking forward to an extremity of this kind (which nevertheless ought not to be entirely out of sight), the common and continual mischiefs of the spirit of party are sufficient to make it the interest and duty of a wise people to discourage and restrain it.”
His countrymen did not heed Washington’s warning and quickly divided themselves into opposing political factions. Though the names have changed over the years, the two major political parties have been battling each other for control over our nation’s government ever since. To many, it seems that Washington’s fears have been realized. Certain in the rightness of their cause, of the superiority of their ideas and their members, they consider those in the opposing camp to be not only wrong, but a threat to the very foundations of our country. Any idea of the other party is to be opposed fervently. They must win elections and gain or remain in power because, to the partisans, their party’s interest is synonymous with the country’s interest. In short, winning is everything.
One of the ways in which political parties seek to gain or maintain ah advantage over the other is through the redistricting process. Every ten years, based on new census data, congressional seats are reapportioned among the states based upon shifting population figures. To many citizens this process is of mild interest, but to the political parties it is a high stakes *427 proposition, a zero sum game in which one party wins and the other loses — for years to come. Subtle shifts in a district boundary line can make the difference between a district that is “safe” for a political party or one that is “competitive” between the two. It can make a big difference in the ability to recruit candidates for particular districts, the amount of time, energy and resources necessary to give a party’s candidate a real chance of success, and ultimately, whether the party can maintain a majority of seats in congress.
Historically, the political party in control of the state legislature has been able to draw the new districts in a manner that protects their party and its incumbents. Voter populations are shifted and clustered based upon how they are likely to vote. The result has often been maps with districts that have unusual boundaries and bizarre shapes, as if some abstract artist had been given free rein. This practice has come to be called political gerrymandering and has been criticized as allowing, in effect, the representatives to choose their voters instead of vice versa.
In 2010, the voters of Florida passed two amendments to the Florida Constitution, commonly referred to as the Fair Districts Amendments, aimed at eliminating such political gerrymandering. These amendments are now codified in the Constitution as Article III Section 20, pertaining to congressional redistricting and Article III Section 21, pertaining to state legislative redistricting. These amendments significantly decrease the Legislature’s discretion in drawing district boundaries. Specifically forbidden is the drawing of a redistricting plan with the intent to favor or disfavor a political party or incumbent. Section 20 reads as follows:
Standards for establishing congressional district boundaries. — In establishing congressional district boundaries:
(a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
(b) Unless compliance with the standards in this subsection conflicts with the standards in subsection 1(a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
(c) The order in which the standards within subsections 1(a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection. Art. Ill, § 20, Fla. Const.
Subsection (a) contains tier-one requirements which must be followed. In addition to prohibiting intent to favor or disfavor a political party or incumbent, this subsection contains two distinct protections for racial and language minorities. The first, which prohibits districts which are drawn with “the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process,” is similar to Section II to of the Voting Rights Act. Commonly referred to as the “vote dilution” provision, this section requires majority minority districts where certain preconditions are met. The second minority protection prohibits a plan or district from “diminishing] their ability to elect repre *428 sentatives of their choice.” Commonly referred to as “retrogression,” this clause tracks Section 5 of the Voting Rights Act and prohibits backsliding in the ability of minority groups to elected candidates of their choice.[1]
Subsection (b) contains provisions requiring compactness and the following of political and geographic boundaries, where feasible.[2] These traditional redistricting principles, tier-two requirements, must be followed unless doing so would conflict with tier-one requirements.
More than one witness during trial explained their opposition to the passage of these amendments by opining that “you can’t take politics out of politics” or that the amendments would be “impossible to implement.” Perhaps, but they are now a part of our organic law and I am bound to interpret and apply them as best I can in order to give effect to will of the voters as so expressed. See In Re: Senate Joint Resolution of Legislative Apportionment 1176, 83 So.3d 597, 597 (Fla.2012).[3] Any act of legislation that is in conflict with the organic law of the constitution is not a valid law. This is a fundamental principle of our political and legal system.
This is a case of first impression interpreting Article III Section 20, dealing with congressional re-districting. The Florida Supreme Court, however, has interpreted the analogue provision in Article III Section 21, which applies to state legislative plans. See Apportionment I, 83 So.3d 597. This lengthy and comprehensive opinion interprets key terms and explains how the various criteria are to be analyzed in reviewing a redistricting plan for constitutionality. It therefore provides me with a detailed road map for reviewing the congressional plan challenged by Plaintiffs.
STANDARD OF REVIEW
A law passed by the legislature is entitled to a presumption of constitutionality. The burden to show otherwise is on those who challenge the law, and that burden is generally said to be beyond a reasonable doubt. This is, in fact, the standard I applied when considering motions for summary judgment earlier in this case. The Plaintiffs ask that I reconsider this decision in light of the Florida Supreme Court’s holding to the contrary in Apportionment I, and its subsequent language in League of Women Voters of Fla. v. Fla. House of Representatives, 132 So.3d 135 (Fla.2013).
In Apportionment I, the Florida Supreme Court specifically rejected the argument that those who challenge redistricting plans must prove facial invalidity beyond a reasonable doubt. It stated that the plans still come to the Court “with an initial presumption of validity” ... and that the review of the plans would be done “with deference to the role of the Legislature in apportionment ...” but stated that its constitutionally required independent review brought with it a lesser degree of deference than would be appropriate with other legislation. Id. at 606-607.
The question is whether this different standard of review is a consequence of the nature of the act reviewed (a redistricting plan), the nature of the new criteria required by the Fair District Amendments (the expanded scope of review), or the specific constitutional mandate that the *429 State House and Senate plans be reviewed by the Florida Supreme Court irrespective of a specific challenge (the procedural process of obtaining review). It was this latter factor, the constitutional requirement of an independent review, which I felt distinguished this case from Apportionment I and thus required the traditional standard of review. Upon reflection, however, I’m not convinced that the different procedural process requires a different standard of review.
It is true that the constitutional mandate for review by the Florida Supreme Court is unique. But should the procedural manner in which a plan is brought before the court for review make a difference in the standard applied in that review? The other two factors noted by the Supreme Court in Apportionment I, the nature of the legislation and the criteria to be applied, are the same in this case. The rights protected are just the same and just as important when redistricting occurs for Congress as it is when it occurs for the State House and Senate. Should the voters be entitled to less constitutional'protection when the redistricting is for the former rather than the latter? Should actions on the part of the legislature in the redistricting process be deemed in violation of the constitution in one instance but not the other?
I think not, and now conclude that it is the nature of the legislation and the nature of what is reviewed that requires a different standard of review. In Apportionment I the Florida Supreme Court observed:
We conclude that the beyond a reasonable doubt standard is ill-suited for an original proceeding before this Court in which we are constitutionally obligated to enter a declaratory judgment on the validity of the legislative plans. Unlike a legislative act promulgated separate and apart from an express constitutional mandate, the Legislature adopts a joint resolution of legislative apportionment solely pursuant to the “instructions” of the citizens as expressed in specific requirements of the Florida Constitution governing this process.
Apportionment I, 83 So.3d 597 at 607-608;
There is a difference between the Court’s role in reviewing a legislative apportionment plan to determine compliance with constitutionally mandated criteria and the Court’s role in interpreting statutes; this Court has stated its responsibility in construing statutes differently. For example, in Tyne v. Time Warner Entertainment, 901 So.2d 802, 810 (Fla.2005), in upholding a statute as constitutional, the Court stated that it had “an obligation to give a statute a constitutional construction where such a construction is possible.” This Court has stated that it is
“committed to the fundamental principle that it has the duty if reasonably possible, and consistent with constitutional rights, to resolve doubts as to the validity of a statute in favor of its constitutional validity and to construe a statute, if reasonably] possible, in such a manner as to support its constitutionality — to adopt a reasonable interpretation of a statute which removes it farthest from constitutional infirmity.”
Apportionment I, 83 So.3d at 607, n. 5 (quoting Corn v. State, 332 So.2d 4, 8 (Fla.1976)).
As this language suggests, the reason for the different standard is because apportionment plans cannot be interpreted. The lines are where they are. It is not a question of searching for a reasonable interpretation of a statute which would make it constitutional. Rather, the inquiry is *430 into the process, the end result, and the motive behind the legislation.
I will therefore, in this case, apply the standard of review articulated in Apportionment I, deferring to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements, with an understanding of my limited role in this process and the important role of the Legislature. My duty “is not to select the best plan” but to determine whether Plaintiffs have proved the plan invalid. Apportionment I, 83 So.3d 597 at 608.[4]
CHALLENGE TO PLAN AS A WHOLE VERSUS A CHALLENGE TO INDIVIDUAL DISTRICTS
Plaintiffs distinguish between their challenge to the redistricting plan as a whole, as being drawn with the intent generally to favor the Republican Party, and their challenge to several individual districts, as being specifically drawn with such intent. I find this to be a false dichotomy, a distinction without difference. The redistricting plan is the result of a single act of legislation. If one or more districts do not meet constitutional muster, then the entire act is unconstitutional. The districts are part of an integrated indivisible whole. So in that sense, if there is a problem with a part of the map, there is a problem with the entire plan.[5]
That does not mean, however, that portions of the map not affected by those individual districts found to be improperly drawn would need to be changed in a redrawn map, even if a general intent to favor or disfavor a political party or incumbents was proven. What would be the point if the other districts are otherwise in compliance? Such a remedy would go far beyond correcting the effect of such noncompliance, but rather would require a useless act that would encourage continued litigation. Therefore, I have focused on those portions of the map that I find are in need of corrective action in order to bring the entire plan into compliance with the constitution.
EVIDENCE RECEIVED UNDER SEAL OR IN CLOSED PROCEEDINGS
A portion of the trial was closed to the public and certain exhibits entered under seal, pursuant to an order of the Florida Supreme Court. Whether this evidence will ever be made public awaits determination by that court of the correctness of my ruling that the associational privilege of the non-parties from whom the evidence was obtained should yield to the interest in disclosure.[6] For purposes of such review, I will briefly explain how I weighed and balanced the appropriate factors and why I tipped the scales in favor of disclosure. Rather than file a partially redacted order, any reference to such evidence here will be *431 general in nature so as not to reveal the specific information contained in the exhibits and testimony.
As noted in my previous Orders, I found that the non-parties, the political consultants, had cognizable First Amendment Rights in the documents and testimony sought by the Plaintiffs in this case.[7] The privilege is not absolute, however, and I had to weigh and balance the competing interests to determine whether that privilege should yield in favor of disclosure. Specifically, I considered the factors set forth in Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir.2010) and determined that the privilege should yield. In the interest of time, I did not elaborate in detail my reasons for that conclusion, announced in open court. I thought it important that the parties know what could and could not be used at trial and that the non-parties have time to obtain a stay if further review was deemed appropriate by the appellate court. The reasons I decided that the associational privilege should yield are as follows:
The case before me of is of the highest importance, going, as it does, to the very foundation of our representative democracy. “Indeed, as [this Court] succinctly stated, it is “difficult to imagine a more compelling, competing government interest” than the interest represented by the challengers’ article III, section 20(a), claims.” League of Women Voters, 132 So.3d 135, 147.
The required disclosure was narrowly tailored and limited. Out of approximately 1800 pages of documents, I required the disclosure of less than a third of those. The disclosure was only to the Plaintiffs’ attorneys with instructions that they not disclose it to third parties other than staff or retained experts, including to their own clients. I felt that the Plaintiffs’ attorneys were in the best position to determine which of these documents were most probative of their claims. As it turned out, they actually offered as evidence only a very small portion of those documents as exhibits.
The documents for which the political consultants claimed privilege evidenced a conspiracy to influence and manipulate the Legislature into a violation of its constitutional duty set forth in Article 3, Section 20 of the Florida Constitution. That was, at least, a reasonable conclusion to be drawn from this and other evidence made available to me in the case to that point. As such, I viewed any chilling effect the release of these- documents might have, on such behavior in the future to be not such a bad thing, and the danger to the legitimate exercise of First Amendment rights rather slight.
Some of the communications, and a good deal of the map work product of the non-party political consultants, were transmitted to persons outside of their group, and made very public by submission to the legislature. If this did not constitute an outright waiver of the privilege as to these items, it lessened the strength of a legitimate claim to its protection.
Unlike the politically hot button issue of homosexual marriage, present in Perry, the underlying subject matter here was redistricting. Although political partisans are no doubt deeply interested in the process, the redistricting process does not address controversial issues of social and moral values that divide the population. It does not arouse the type of intense passions that might justify a real fear of physical danger or mass public reprisals *432 against the members if the information was made public.
The evidence was highly relevant and not available from other sources. When I considered this factor, I tried my best to look at it from the perspective of the judge rather than the ultimate fact finder, the two roles I play in a non jury trial. One of the principal theories of the Plaintiffs in this case was that legislative staff and leaders collaborated with these political consultants to produce a redistricting map that violated the constitution by favoring the Republican Party and its incumbents.
While it is true that the documents claimed as privileged contain no glaring “smoking gun” in terms of direct communications between the consultants and specific staff or legislators, that does not mean they are not highly relevant. Under them theory of the case, it was essential for the Plaintiffs to first prove that there was a secretive shadow process of map drawing by the political consultants which found its way into the enacted congressional map before they could prove the second prong — the connection of this process to the Legislature.
Nor was this evidence available from other sources. Yes, the Plaintiffs engaged in extensive discovery and obtained e-mails and other documentation which they argued was compelling evidence in support of their claim. But the Plaintiffs’ advocacy on this point should not be confused with the reality of what they actually had— which were bits and pieces of information which they sought to weave into a narrative consistent with their theory. The legislature had, in fact, destroyed e-mails and other evidence of communication regarding the redistricting process and so had many of the non-party political consultants.
Throughout the discovery process, these political consultants maintained that they were told by legislative leaders that they could not “have a seat at the table” in the drawing of the redistricting maps, and that they abided by that admonition. They denied having any input in the Legislative map drawing efforts or otherwise trying to influence how the maps were drawn. They denied that they submitted maps in the public submission process for redistricting. Any map drawing on their part was described as a hobby, something for personal use only, an exercise done to see what could be done on á map and to anticipate what the Legislature might produce.
What this additional evidence gave the Plaintiffs was the ability to confront these denials, to lay bear not only the fact that some of these consultants were submitting maps to the legislature, but to show how extensive and organized that effort was, and what lengths they went to in order to conceal what they were doing. Notably, even in the face of this evidence, the non-party witnesses at trial did their best to evade answering direct questions on the subject, often using semantic distinctions to avoid admitting what they had done.
At the time I considered the issue, the Plaintiffs did have some evidence that suggested otherwise but, considering the high burden on them to prove them case, I couldn’t say that it would have been enough, or that this additional evidence wouldn’t be crucial to the case. After all, I had not heard all of the evidence nor had the opportunity to view it in context. Now that I have, I can say that the evidence filed under seal was very helpful to me in evaluating whether Plaintiffs had proved that first prong of their theory.
Moreover, as noted above, without sufficient proof of this secret, organized campaign to subvert the supposedly open and *433 transparent redistricting process, the question of whether the Plaintiffs could sufficiently tie the Legislature to that effort becomes moot. To conclude that this evidence was not highly relevant to this central issue of legislative intent would have been to prejudge the case and determine ahead of time that the Plaintiffs would not be able to prove that connection. This I was not prepared to do.
For all of these reasons, I tipped the scales in favor of the First Amendment privileges of the non-parties yielding to the need and interest of disclosure in this particular case.
DETERMINING LEGISLATIVE INTENT GENERALLY
One of Plaintiffs’ claims is that the entire redistricting process was infected by improper intent. Specifically, they argue that, despite the Legislature’s assertion that its redistricting process was open, transparent and non-partisan, a secret, highly partisan map drawing campaign was being conducted in the shadows that was intended to, and did, favor the Republican Party and its incumbents.
The first question in evaluating this claim is to ask, whose intent? The language in Section 20 prohibits a map being “drawn” to favor or disfavor a political party or an incumbent, not “adopted” or “enacted.” Yet, the challenge is to an act passed by the Legislature, a collective body. When I asked the attorneys at the beginning of trial about this issue, I posed the hypothetical of a staff member charged with actually drawing the map, who did so with the intent to favor a political party, but hid this intent from other staff and members of the Legislature. Both sides agreed that it is the Legislature’s intent that is at issue, not the staff member. Plaintiffs’ attorneys conceded that, without more, this would be insufficient to show improper intent as contemplated by Article III, Section 20 — though they assert that the evidence indeed shows more.
There are some real problems in trying to make such a determination of legislative intent in this case. First, when we speak of legislative intent generally, we are concerned with trying to ascertain the meaning of language used in the enacted law. The goal is to interpret the language so as to give it the effect intended. In such a situation, we look to such things as the common meaning of the words used, legislative history, staff reports, statement of legislative intent in the enactment clause, transcripts of committee hearings, and statements made on the floor of the House and Senate. Some legal scholars suggest that one can never determine legislative intent from such sources, or indeed at all.[8]
This problem is exacerbated in a case like the one before me. Here, we are looking at something entirely different. See, e.g., League of Women Voters of Fla. v. Fla. House of Representatives[9], 132 So.3d 135, 150 (Fla.2013) (“In this context, however, the ‘intent’ standard in the specific constitutional mandate of article III section 20(a), is entirely different than a traditional lawsuit that seeks to determine legislative intent through statutory construction.”). It is not the meaning of the words used in the legislation that must be *434 interpreted. We can see clearly where the lines are drawn on the map. Rather, the question is what was the motive in drawing these lines.
In this inquiry, it is extremely unlikely that the bill’s sponsor would stand up on the floor of the House or Senate and advise his or her colleagues that the intent of the legislation is to favor the Republican Party. Nor would you expect such comments at committee meetings, or anywhere else in public for that matter. Even if a legislator expressed such intent on the floor, can we assume that all of his or her colleagues were convinced and so motivated in their votes?
Do we look to evidence of improper intent of the leaders? If so, how many other legislators, if any, would need to be “in on it” in order to find it sufficient proof of the body’s intent? What if legislative leaders and staff knew that partisan groups or individuals were drawing maps with intent to favor a political party and submitting them to the Legislature through third persons in order to conceal the identity of the map drawer, but they didn’t inform legislative members of this? On the flip side, if leaders took reasonable precautions to insulate the staff map drawers from partisan influence, should we conclude that the Legislature therefore had no improper partisan intent in adopting the map? How does that inform us as to what was motivating the members of the legislature?
Certainly, the actions and statements of legislators and staff, especially those directly involved in the map drawing process would be relevant on the issue of intent. As the Florida Supreme Court has explained,
the communications of individual legislators or legislative staff members, if part of a broader process to develop portions of the map, could directly relate to whether the plan as a whole or any specific districts were drawn with unconstitutional intent.... [I]f evidence exists to demonstrate that there was an entirely different, separate process that was undertaken contrary to the transparent [redistricting] effort in an attempt to favor a political party or an incumbent in violation of the Florida Constitution, clearly that would be important evidence in support of the claim that the Legislature thwarted the constitutional mandate.
Apportionment IV, 132 So.3d at 149-150. See also, e.g., Easley v. Cromartie, 532 U.S. 234, 254, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (finding “some support” for district court’s conclusion that racial considerations predominated in drawing of district boundaries in email sent from legislative staff member to two senators); Texas v. United States, 887 F.Supp.2d 133, 165 (D.D.C.2012) (noting that an “email sent .between staff members on the eve of the Senate Redistricting Committee’s markup of the proposed plan” fueled the court’s “skepticism about the legislative process that created” a challenged district).
It is very difficult, however, to know when such evidence establishes not just individual intent or motive, but the intent or motive of the collective body. It seems that the more reliable focus in ■ such an inquiry would be on what was actually produced by the Legislature, the enacted map. Specifically, an analysis of the extent to which the plan does or does not comply with tier two requirements is a good place to start. Can one draw a map that meets tier-two requirements but nonetheless favors a political party or an incumbent? Sure, but it is more difficult.
Furthermore, a failure to comply with tier-two requirements not only supports an inference of improper intent, it is an independent ground for finding a map uncon *435 stitutional. See Apportionment I, 88 So.3d 597 640-641. Additional direct and circumstantial evidence of intent may serve to strengthen or weaken this inference of improper intent. Therefore, I first examine the map for apparent failure to comply with tier-two requirements of compactness and utilization of political and geographical boundaries where feasible, then consider any additional evidence that supports the inference that such districts are also in violation of tier-one requirements.
SPECIFICALLY CHALLENGED DISTRICTS
The tier-two standards at issue in this case are compactness and the requirement that districts follow geographic and political boundaries where feasible. Because Florida and many of its counties are cities are not perfectly square or round, there is often tension between these two requirements.
An evaluation as to compactness “begins by looking at the shape of a district.” Apportionment I, 88 So.3d 597, 634 (internal quotation marks and citation omitted). A district “should not have an unusual shape, a bizarre design, or an unnecessary appendage unless it is necessary to comply with some other requirement.” Id,.; see also Id. at 636 (emphasizing that “non-compact and ‘bizarrely shaped districts’ require close examination”). Districts “containing ... finger-like extensions, narrow and bizarrely shaped tentacles, and hook-like shapes ... are constitutionally suspect and often indicative of racial and partisan gerrymandering.” Id at 638 (internal quotation marks and alteration omitted). Thus, for example, the Florida Supreme Court struck down several Florida Senate districts in the Initial 2012 Senate Plan in part because those districts had “visually bizarre and unusual shapes.” Id.
The compactness review should also utilize “quantitative geometric measures of compactness” derived from “commonly used redistricting software.” Id. at 635. For example, the Florida Supreme Court has relied on the Reock method and the Area/Convex Hull method to assess compactness of voting districts. See Id. The Reock method “measures the ratio between the area of the district and the area of the smallest circle that can fit around the district.” Id. The Area/Convex Hull method “measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district.” Apportionment I, 83 So.3d 597, 635.
Tier-two mandates also direct the Legislature to draw districts utilizing existing political and geographical boundaries where feasible. Political boundaries include “cities and counties,” Id. at 637, while geographical boundaries include “rivers, railways, interstates and state roads,” Id. at 638. This requirement is more flexible than the compactness requirement. But “the choice of boundaries” is not “left entirely to the discretion of the Legislature,” Id. at 637, and it may not use any boundary (e.g., a “creek or minor road”) that suits its purposes, Id. at 638. In addition, although no priority of importance is given to either, the requirement to use existing boundaries contains the modifier, “where feasible.”
A. Congressional District 5
Congressional District 5 does not adhere to the tier-two standards in Article III Section 20. It is visually not compact, bizarrely shaped, and does not follow traditional political boundaries as it winds from Jacksonville to Orlando. At one point, District 5 narrows to the width of Highway 17. The district has a Reock score of only 0.09. Enacted District 5 has majority black voting age population *436 (BVAP), but the benchmark districting was only a plurality BVAP district. The Defendants’ argument that the vote dilution provision of Article III Section 20 and Section 2 of the Voting Rights Act required a majority BVAP district and that this configuration was necessary to achieve that end, is not supported by the evidence.
Plaintiffs have shown that a more tier-two compliant district could have been drawn that would not have been retrogressive. The plans proposed by the House of Representatives prior to conference committee plan 9047 being adopted were all more compact and split fewer counties. While not model tier-two compliant districts, these iterations did avoid the narrow appendage jutting from the body of the district into Seminole County. Such appendages are particularly suspect of prohibited intent to benefit a political party or incumbent. Furthermore, the House’s various iterations achieved a BVAP of between 47 and 48 percent. The House’s chief map drawer, Alex Kelly, testified that he performed a functional analysis on these iterations, and that this level of minority population would not have been retrogressive. Indeed, this is higher than the BVAP of benchmark district when it was enacted.
The vote dilution provisions in Article III, Section 20 and in the Voting Rights Act do not require the creation of a majority-minority district wherever possible, but only where certain conditions — conditions first announced in Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) — are satisfied. First, three preconditions must be present: (i) the minority population is sufficiently large and geographically compact to be a majority of the voting-age population; (ii) the minority population is politically cohesive; and (iii) the majority population votes sufficiently as a bloc to enable it usually to defeat the candidates preferred by minorities. Apportionment I, 83 So.3d at 622 (citing Gingles, 478 U.S. at 50-51, 106 S.Ct. 2752).
The Legislature made no effort during the redistricting process to determine if the Gingles preconditions existed for this district, nor does the evidence introduced at trial demonstrate that they exist now. The minority population is not sufficiently large and geographically compact to constitute a majority of the voting age population. To achieve a BVAP over 50%, the district connects two far flung urban populations in a winding district which picks up rural black population centers along the way. The Gingles compactness inquiry certainly is focused on more than just district lines. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 433, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). But it also doesn’t ignore such lines. See Id. District 5 is simply not compact for the purpose of the Gingles analysis.
Nor does the evidence prove the third precondition. There is no dispute that there is racially polarized voting in Northeast Florida. However, Defendants have not shown that this polarization is legally significant. Because “the extent of bloc voting necessary to demonstrate that a minority’s ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district.” Thornburg v. Gingles, 478 U.S. at 50, 106 S.Ct. 2752. The evidence is undisputed that the benchmark district, which was never majority-minority, elected an African-American to Congress during its entire existence.. Additionally, analysis by Dr. Brunell, an expert retained by the House, suggested that there would be a 50/50 ability to elect a *437 minority candidate of choice with a BVAP as low as 43.6%. Thus, the evidence does not establish that the majority population votes sufficiently as a bloc to enable it usually to defeat the candidates preferred by minorities.
I also find that the decision to increase the district to majority BVAP, which was accomplished in large part by creating the finger-like appendage jutting into District 7 and Seminole County, was done with the intent of benefiting the Republican Party. I reach this conclusion based in part on the inference that the Florida Supreme Court suggested could be drawn from oddly shaped appendages that had no legal, justification. See Apportionment I, 83 So.3d at 618 (“[Wjhere the shape of a .district in relation to the demographics is so highly irregular and without justification that it cannot be rationally understood as anything other than an effort to favor or disfavor a political party, improper intent may be inferred”). This inference is also buttressed by the evidence of improper intent in the redistricting process generally, and as specifically related to the drawing of District 5, the most significant of which I will outline now.
1. In General
Plaintiffs’ theory of the case regarding improper intent is that Republican leadership in the House and the Senate, their key staff members, and a small group of Republican political consultants conspired to avoid the effective application of the Fair District Amendments to the redistricting process and thereby successfully fashioned a congressional map that favors the Republican Party and its incumbents. The strategy they came up with, according to the Plaintiffs, was to present to the public a redistricting process that was transparent and open to the public, and free from partisan influences, but to hide from the public another secretive process. In this secretive process, the political consultants would make suggestions and submit their own partisan maps to the Legislature through that public process, but conceal their actions by using proxies, third persons who would be viewed as “concerned citizens,” to speak at public forums from scripts written by the consultants and to submit proposed maps in their names to the Legislature, which were drawn by the consultants.
What is clear to me from the evidence, as described in more detail below, is that this group of Republican political consultants or operatives[10] did in fact conspire to manipulate and influence the redistricting process. They accomplished this by writing scripts for and organizing groups of people to attend the public hearings to advocate for adoption of certain components or characteristics in the maps, and by submitting maps and partial maps through the public process, all with the intention of obtaining enacted maps for the State House and Senate and for Congress that would favor the Republican Party.
They made a mockery of the Legislature’s proclaimed transparent and open process of redistricting by doing all of this in the shadow of that process, utilizing the access it gave them to the decision makers, but going to great lengths to conceal from the public their plan and their participation in it. They were successful in their efforts to influence the redistricting process and the congressional plan under review here. And they might have successfully concealed their scheme and their actions from the public had it not been for *438 the Plaintiffs’ determined efforts to uncover it in this case.
The closer question is whether the Legislature in general, or the leadership and staff principally involved in drawing the maps, knowingly joined in this plan, or were duped by the operatives in the same way as the general public. The Defendants argue that if such a conspiracy existed, there is no proof that anyone in the Legislature was a part of it. If portions of the operatives’ maps found their way into the enacted maps, they say, it was not because leadership or staff were told or knew they came from this group, but rather because the staff, unaware of their origins, saw the proposals as improving the draft maps they were working on.
The most compelling evidence in support of this contention of the Defendants is the testimony of the staff members who did the bulk of the actual map drawing for the Legislature. I had the ability to judge the demeanor of Alex Kelly, John Guthrie and Jason Poreda at trial and found each to be frank, straightforward and credible. I conclude that they were not a part of the conspiracy, nor directly aware of it, and that significant efforts were made by them' and their bosses to insulate them from direct partisan influence. I accept that their motivation in drawing draft maps for consideration of the Legislature was to produce a final map which would comply with all the requirements of the Fair District Amendments, as their superiors had directed them.
That being said, the circumstantial evidence introduced at trial convinces me that the political operatives managed to find other avenues, other ways to infiltrate and influence the Legislature, to obtain the necessary cooperation and collaboration to ensure that their plan was realized, at least in part. They managed to taint the redistricting process and the resulting map with improper partisan intent. There is just too much circumstantial evidence of it, too many coincidences, for me to conclude otherwise.
a. Destruction of Records
The Legislative Defendants argue that despite the extensive discovery conducted by the Plaintiffs, there is a paucity of documentary evidence that ties the activities of the operatives with a single legislator so as to prove improper legislative intent. I note, however, that the Legislators and the political operatives systematically deleted almost all of their e-mails and other documentation relating to redistricting. There was no legal duty on the part of the Legislature to preserve these records, but you have to wonder why they didn’t. Litigation over their plans was “a moral certainty,” as their lawyers put it earlier in this ease, and intent would be a key issue in any challenge.
b. Early Meetings of Legislative Leaders and Staff with Political Consultants
In December of 2010 and January of 2011, Legislative leaders, staff members and attorneys met with a group of Republican political consultants to discuss the upcoming 2012 redistricting process. The attendees for one or both included Senator Gaetz, Representative Weatherford, legislative staff members Alex Kelly, Chris Clark and John Guthrie, counsel for the House and Senate, Richard Heffley, Marc Reichelderfer, Patrick Bainter, Benjamin Ginsberg, Joel Springer, Andrew Palmer, and Frank Terraferma.
Clark was the chief legislative aide for Gaetz during the 2012 Redistricting Process and Guthrie was the Senate staff member in charge of map drawing. Heff-ley was a political consultant who has worked with a number of Republican legislators and candidates, including Gaetz. *439 He was, at the time, under contract with The Republican Party of Florida (RPOF) to provide unspecified services relating to redistricting. Reichelderfer was a political consultant who had worked with a number of Republican legislators and candidates, including Speaker Dean Cannon. Bainter was a political consultant who had worked with a number of Republican legislators and candidates, including Representative Daniel Webster. Bainter was the owner of Data Targeting, Inc. (“Data Targeting”), a political consulting and polling firm located in Gainesville, Florida. Ginsberg was an attorney based in Washington, D.C., recognized in the area of redistricting and had represented the National Republican Party in redistricting matters. He also either was or came to be counsel for Heffley, Reichelderfer and Terraferma. Springer was employed by the RPOF as director of Senate campaigns. Palmer was employed by the RPOF as director of House campaigns. Terraferma was a political consultant who worked with a number of Republican legislators and candidates, including Weatherford.
The meetings were not open to the public, and there is no written record of what was discussed at either meeting. No one who testified at trial about them seemed to be able to remember much about what was discussed, though all seemed to agree that the political consultants were told that they would not have a “seat at the table” in the redistricting process. No one clearly articulated what that meant exactly, but there was testimony that they were told that they could still participate in redistricting through the public process “just like any other citizen.” One witness testified that the participants discussed whether a privilege could be identified to prevent disclosure of redistricting-related communications among political consultants, legislators, and legislative staff members, and concluded that no privilege would apply.
Reichelderfer prepared a memorandum following the December, 2010 meeting that included the following notations: “What is our best operational theory of the language in [Amendments] 5 and 6 related to retrogression of minority districts?”; “Central FL Hispanic seats? Pros and Cons”; “Evolution of maps — Should they start less compliant and evolve through the process — or—should the first map be as near as compliant as possible and change very little? Or other recommendations?”; “Communications with outside non-lawyers — how can we make that work?”
There is nothing necessarily sinister about such meetings. Most of the attendees were friends or professional colleagues and perhaps it could be considered a courtesy extended. But it doesn’t look good if you are promoting openness, transparency and neutrality in the redistricting process. There was really no reason to convene two meetings just to tell active political partisans of the Republican Party that they would not “have a seat at the table.” A letter or e-mail would suffice, or some general public announcement as to what the protocol would be going forward.
And there are a few curious things about these meetings and their connection to subsequent events that are troubling. First, this was a highly partisan group and all the political consultants were very interested in the redistricting process. It is inconceivable to me that, if as testified to, they were advised that they could participate in the public process “just like any other citizen,” they would not have done so. How could these political consultants, who were intensely interested in the process, whose jobs or livelihoods were tied into protecting their clients’ and their party’s interests with respect to redistricting, not take the opportunity to submit pro *440 posed maps through the public portal, to attend at least some of the public hearings and speak out?
The reality, and the irony, is that there would be absolutely nothing wrong about the attendees at those meetings submitting proposed maps or partial maps. The difference is, if done in the open, then those reviewing the submissions could take into account the source in evaluating whether it was neutral or whether it might tend to favor or disfavor a political party or an incumbent. One of the political consultants lamented that if he had submitted maps in his own name, he would probably have come under attack, accused of trying to favor his party or its incumbents. Well, of course his submission might be closely scrutinized, in the same way that a proposed map submitted by the Florida Democratic Party might be taken with a grain of salt. That’s how it should be if one is concerned about improper partisan intent influencing the drawing of the map.
Regardless, given the circumstances, it’s hard to imagine that the legislative leaders and staffers would not have expected active participation in the public redistricting process by those political consultants at the meetings. And when the process was under way and maps were being submitted by members of the public, and public hearings were being held, and these political consultants were not in attendance, and none of the maps coming from the public had any of their names on them, I would think that the staff and legislative leaders would find it extremely strange, that they might even ask why not. But they didn’t.
One of the things that the Defendants tout as showing that there was no improper partisan intent in the drafting of the maps is to point to the fact that as things progressed, each succeeding map that was drawn was an improvement over the one before it in terms of compactness, leaving cities and counties intact and following geographical boundaries. Coincidentally, though, that corresponds with a strategy suggested from Reichelderfer’s notes, i.e., start with less compliant maps and work toward a more compliant map.
The Defendants also tout the opportunity for the public to have input by submitting proposed maps or partial maps, and by attending public hearings which were held throughout the state. And, the Defendants point out, all of this was open, transparent and on the record. Although that sounds like a good idea — who can argue that openness and transparency are not good things when it comes to government — it provided the means by which partisan maps, secretly drawn and submitted by political operatives, could be incorporated into the enacted map with no one in the general public the wiser. Staff members were encouraged to consider maps submitted by the public and if they contained concepts or configurations that made the draft map “better,” to incorporate them.
Paid political operatives aside, when you think about it, anybody who would go to all the trouble of drawing a map and presenting it to the legislature for consideration is probably more likely to be motivated by personal or party politics than by an altruistic desire to draw the most constitutionally compliant map possible, free of any partisan intent. And if so, relying upon publicly submitted maps may not be the best way to protect against partisan influence.
If you choose, however, to accept and perhaps rely upon publicly submitted maps, it seems to me that you should have a way to address the possible, nay probable, partisan intent of the drafters of at least some of those maps. The Legisla-, ture’s answer was apparently to ignore it. *441 Both the Senate and the House leadership instructed their staff not to consider the potential political performance of any district drawn (except in the House as to districts involving tier one minority issues), nor were they to concern themselves with the origins or the author of any publicly submitted map.
This seems on its face a neutral approach, and I appreciate the dilemma that arises: If I start evaluating a proposed map for political performance because of suspicion that it is the result of improper partisan intent, and make “corrections,” haven’t I now altered the map with the intent to favor or disfavor a political party? While I appreciate this concern, I don’t know that it is a satisfactory answer to say that, as long as the improper intent behind a submitted map did not originate with me, and I am not expressly told about it, I don’t have to worry about it. Turning a blind eye to the probability of improper intent in these maps is not the same as neutrality.
Perhaps it would be best to have it out on the table for all to see and evaluate. Considering political performance is not the same as intending to favor or disfavor a political party or incumbent, and an open process would assist in evaluating which was in play in a particular situation. And in truth, every single legislator or senator could very easily determine on their own the potential political performance of any district on a proposed map and vote on it accordingly. Any interested citizen could access such information and advise their representative of his or her concerns or feelings about a particular district. You might insulate the staffers from political consultants and partisan influences but you can’t insulate the entire Legislature.
c. Continued Involvement of the Political Consultants in the Redistricting Process
On June 1, 2011, Senator Gaetz sent an email to legislators providing information about upcoming public hearings about the redistricting process. The metadata for the email reveals that a “blind copy” of it was sent to Heffley and Terraferma. At trial, Senator Gaetz had no explanation for why this was done, pointing out only that the information in the e-mail was public information and that he wasn’t sure someone else in his office had not sent it out under his name. Again, there would be absolutely nothing wrong with sending this information to Heffley and Terraferma, but why secretly send a blind copy? And if Senator Gaetz did not send it out, someone in his office was keeping these operatives in the loop.
Two of the consultants, Reichelderfer and Hefley, were directly involved in the redistricting process, acting as go be-tweens for leadership of the two chambers regarding the redistricting process. This was purportedly because of a lack of a good working relationship between the Speaker of the House and the President of the Senate. Yet, by all accounts, the actual staff members of each chamber who were working on the maps got along well with each other, as did the chairmen of the redistricting committees. Regardless, in their insider roles, Hefley and Reiehelderer did not have to speak directly to staff map drawers, or even leadership, to infect and manipulate the map drawing and adoption process.
As noted above, the House and Senate destroyed most e-mails and other records of communications concerning the redistricting process, as did the political consultants. What was recovered, however, allowed the Plaintiffs to show that Kirk Pepper, Deputy Chief of Staff to then *442 Speaker Dean Cannon, was regularly sending to Reichelderfer copies of various draft maps of the Legislature well before they were disclosed to the public.
The Defendants acknowledge that this was improper, but say it is not evidence of improper intent on the part of the Legislature because: 1) It was done without permission from his boss; 2) It was not done for the purpose of influencing the actual drafting of the maps; 3) Pepper had no map drawing responsibilities and gave no directions on how the maps should be drawn; and 4) He was simply trying to give his friend, Reichelderfer, a heads up on what to expect so that he could get ahead of his competition and better advise his clients.
Pepper and Reichelderfer apparently did communicate about the political performance of the maps, however, as evidenced by a series of e-mails between the two. For example, on November 27, 2011, right after receiving an early unpublished copy of the Senate’s first draft congressional map from Pepper, Reichelderfer advised Pepper that the district of Representative Daniel Webster was “a bit messed up,” and Pepper responded by inquiring “performance or geography?” Mr. Pepper testified that, though it may seem that they were discussing political performance, his reply to his friend was actually a signal reminding him that they should not discuss such things. Perhaps, but that is a very unusual and illogical interpretation.
In an email exchange with Reichelder-fer, Representative Cannon commented that “we are in fine shape” as long as “the Senate accommodates the concerns that you [Reiehelderfer] and Rich [Heffley] identified in the map that they put out tomorrow.” The Defendants explained this exchange by saying that the concerns referred to was the general concern by the House that the Senate map would be so far different than the House map that it would make reconciliation of the two maps difficult. Again, perhaps, but this seems a stretch given the language used.
In October of 2011, Frank Terraferma emailed Chairman Weatherford reporting that Pepper was at the Republican Party of Florida huddled on a computer with Rich Hefley and working on “congressional redistrieting if I had to guess.” Now, it’s certainly possible that Terraferma was mistaken or simply speculating without any basis, as was suggested at trial, but one has to wonder why he would make this assumption if Pepper really had nothing to do with the redistricting process. Maybe not officially, but as noted above, he was heavily involved in helping his friend, Rei-chelderfer with inside information. From November 2011 until January 2012, Pepper transmitted at least 24 draft maps to Reichelderfer. In most cases, Pepper provided the draft maps to Reichelderfér before their release to the public. In many cases, Pepper provided Reichelderfer with draft maps that were never released to the public.
Reichelderfer made a number of modifications to these and other maps that he received from Pepper. Some of those revisions combine a District 5 with a Black VAP of over 50% and a Hispanic VAP of District 9 over 40%. (Compare CP Ex. 885 with CP Ex.' 1050). As a result of such changes, the performance of Districts 5, 7, 9, and 10 went from being four Democratic performing or leaning seats in early maps such as H000C9001 to two Democratic and two Republican performing seats in the enacted map, HOOOC9047 based on the results of the 2008 presidential election.[11] Indeed, many of the maps
*443 and partial maps the consultants focused on seemed to be in the Central Florida area, which coincidentally were the areas in the enacted map I have found to be problematic.
d. Prior Finding of Partisan Intent in State Senate Plan
The Florida Supreme Court found improper partisan intent present in the State Senate Map. The same process and the same people were involved in drafting the congressional map. It seems unlikely that the same taint would not affect that map as well. There is a difference in that the former was drawn without any input from the House and the latter the result of a collaborative effort. I note, however, that my concerns with Districts 5 and 10 involve changes to the House’s map in deference to the Senate. The problems that I find in Districts -5 and 10 were not present, at least to the same degree, in the House version.
2. Evidence of Partisan Intent Specifically Related to District 5
The decision to change District 5 to make it a majority BVAP was made at a non-public meeting attended by Alex Kelly and John Guthrie, the chief map drawers for the House and Senate respectively, and Will Weatherford and Don Gaetz, chairmen of the redistricting committees in their respective chambers. They had been given direction before the meeting from their respective chamber leaders, Speaker of the House Dean Cannon and Senate President, Mike Haridopolis. Notably, Alex Kelly testified that Speaker Cannon told him that the Senate would likely request to push District 5 over 50% BVAP and that they should be prepared to accede to that request. Speaker Weather-ford [12] testified that the House only went along with this request because the Senate made a “compelling” argument for it, but he could not remember the substance of the argument. The reason given at trial for this change was that the District was very close to 50% BVAP and that it seemed prudent to avoid a possible VRA suit by bumping it up enough to create a majority-minority district. That justification is not compelling, without some showing that it was legally necessary to create a majority-minority district.
The changes also increased the Republican performance of neighboring District 7.[13] In the version of District 7 House Plan 9043, Alex Sink (D) would have received 48.5% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 50.5% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 39.7% of the two-party vote in the 2006 gubernatorial election. In the enacted version of District. 7, Alex Sink (D) would have received 47.5% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 49.6% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 39.0% of the two-party vote in the 2006 gubernatorial election. The change resulted in a decrease in registered Democrats in District 7 from 36.0% to 35.0% based on 2010 general election data.
Based on the above, I find that Plaintiffs have proved that District 5 unnecessarily *444 subjugates tier-two principals of compactness. They have also proved portions of District 5 were drawn to benefit the Republican Party, in violation of tier-one. Accordingly, District 5 is invalid and must be redrawn. Any surrounding districts affect by such a change must likewise be redrawn.
Congressional District 10
District 10 is overall fairly compact. It has a Reock Score of .39 and a Convex Hull Score of .73. However, there is an odd-shaped appendage which wraps under and around District 5, running between District 5 and 9. Such appendages render a district not compact pursuant to tier-two standards and should be avoided unless necessary to comply with tier-one requirements. See Apportionment I, 83 So.3d at 634 (“Compact districts should not have an unusual shape, a bizarre design, or an unnecessary appendage unless it is necessary to comply with some other requirement”). Plaintiffs have shown that the district could be drawn in a more compact fashion, avoiding this appendage. Plaintiffs adduced multiple iterations emanating from the House redistricting suite which did not contain this appendage and were otherwise more compact. Indeed these iterations were more compact in Central Florida generally, as the chart below will show.

Central Florida Regional Compactness Chart

[[Image here]]
The Central Florida Regional Compactness Chart lists compactness scores for all districts included in Orange, Osceola, and Polk Counties.
Defendants contend that this appendage, and the configuration of Central Florida generally, is necessary to achieve tier-one minority protection in both Districts 5 and 9. Because the appendage is highly populated and white majority, they argue that placing its population in either of those districts would have impermissibly lowered the minority VAP. I cannot agree.
While the creation of a Hispanic influence district in CD 9 may be a legitimate goal, there is no evidence before me to suggest that it was entitled to tier-one protection. There was no Hispanic opportunity district in Central Florida under the benchmark plan. There was no evidence that a district without the appendage would lead to retrogression elsewhere. Indeed House plan 9043 had a non-retrogressive BVAP of 48.03% in CD 5 and a HVAP of 39.59% in CD 9.[14] Nor is District *445 9 entitled' to vote-dilution protection. There was no evidence to suggest that a Hispanic majority district could be created in Central Florida. Defendants cannot justify deviation from a tier-two constitutional requirement because of a desire to create a Hispanic influence district.
I also find that District 10 was drawn to benefit the Republican Party and the incumbent. I reach this conclusion based in part on the inference that the Florida Supreme Court suggested could be drawn from oddly shaped appendages that had no legal justification. See Apportionment I, 83 So.3d at 618. This inference is also buttressed by the general evidence of improper intent outlined above in my analysis of District 5 and the following evidence related specifically to the drawing of District 10.
The appendage benefited the incumbent Representative Webster by returning to District 10 territory that was part of his benchmark District 8 and improved the Republican performance of District 10 in two out of the three elections relied upon by the Florida Supreme Court in Apportionment I. In the version of District 10 in H000C9043, Alex Sink (D) would have taken 44.9% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 48.0% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 39.0% of the two-party vote in the 2006 gubernatorial election. In the enacted version of District 10, Alex Sink (D) would have received 45.6% of the two-party vote in the 2010 gubernatorial election, Barack Obama (D) would have received 47.6% of the two-party vote in the 2008 presidential election, and Jim Davis (D) would have received 38.9% of the two-party vote in the 2006 gubernatorial election. In addition, the change lowered the number of registered Democrats in District 10 from 37.2% in H000C9043 to 36.8% in H000C9047 based on 2010 general election data.
Dr. Ansolabehere also testified that the changes between House plan 9043 and adopted plan 9047 altered the boundaries of that district primarily by moving 80,000 voting age people out of District 10 into District 9, while moving 71,000 voting age people out of District 9 to District 10. Dr. Ansolabehere testified that these changes were not necessary to make District 9 a minority-performing district, because without them District 9 was already a minority-performing district, and the populations that were shifted were majority white populations. As a result of this appendage, the decrease in Democratic registration in District 10 and corresponding increase in Democratic registration in the already comfortably Democratic District 9 were of significant Republican benefit for a competitive district such as District 10.
Plaintiffs have proved that District 10 unnecessarily subjugates tier-two principles of compactness. They have also proved portions of District 10 were drawn to benefit the Republican Party, in violation of tier-one. Accordingly, District 10 is invalid and must be redrawn, as must the surrounding districts affected by such change.
Districts 13 & 14
Plaintiffs claim that Districts 13 and 14 are unconstitutional because they violate the tier-two standard, requiring that, where feasible, districts should utilize existing political and geographic boundaries. Plaintiffs point to District 14, which reaches across Tampa Bay to take in a portion of South St. Petersburg, splitting the city of St. Petersburg and Pinellas County. Plaintiffs suggest that this configuration is not justified by any tier-one consideration. They suggest that it is indicative of improper intent to benefit the Republican *446 Party and the incumbent, the late Republican Congressman Bill Young.
The benchmark predecessor to District 14 (District 11 in 2002) had a BVAP population of 26.78% and a HVAP of 25.84%. As adopted, Congressional District 14 has a BVAP of 25.63% and a HVAP of 25.61%. Romo Plaintiffs proposed maps A and B have' a BVAP of 21.73% and a HVAP of 26.91%
Plaintiffs have not proved tier-two deviations. While the Romo Plaintiffs’ proposed map does increase the compactness of District 13, it causes District 14 to become less compact under both Reock and Convex Hull measurements. On a regional level, the Romo proposed map causes every district which touched District 13 and 14 to become less compact than the adopted plan, 9047. As the chart below shows, the Romo maps would decrease the compactness in five of the six districts, while increasing the compactness in only one. The legislature was not required to make this tradeoff in compactness to avoid splitting Pinellas County.

Tampa Bay Regional Compactness Chart

[[Image here]]
The Tampa Bay Regional Compactness Chart lists compactness scores for all which include portions of Hillsborough, Pasco, Pinellas, and Manatee Counties the adopted plan.
Nor have Plaintiffs proved that the decision to include portions of Pinellas County in District 14 was the result of partisan mal-intent to benefit the Republican Party. Unlike Districts 5 and 10, there are no flagrant tier-two deviations from which I can infer unlawful intent. The decision to have District 14 invade Pinellas County was made early in the process by the professional staff, as most if not all of the iterations emanating from both houses broke into Pinellas County. Thus, unlike changes made to District 5 by the leaders during conference committee, this decision was made by the Staff whom I have found were insulated from the political consultants. I simply cannot conclude, on partisan effect alone, that the decision to incorporate portions of South St. Petersburg into District 14 was done with the intent to benefit the Republican Party or the incum-bant member of Congress.
Districts 21 & 22
Plaintiffs contend that Districts 21 and 22 are invalid. They point to testimony from Alex Kelly along with redistricting iterations emanating from the House redistricting suite. They suggest it was possible to draw Districts 21 and 22 stacked on top of each other north to south rather than in the adopted configuration with the districts running parallel to each other down the coast. This configuration could have avoided county and city splits. Plaintiffs contend that failure to adopt this configuration was an unnecessary deviation from tier-two requirements and evidenced *447 an intent to benefit the incumbents in that area.
Plaintiffs have not met their burden of proving unnecessary deviation from tier-two requirements. The iteration Plaintiffs point to might be more compliant with tier-two in a vacuum, but they have not shown that it could be achieved without violating tier-one requirements for minority protection in neighboring District 20.[15] Alex Kelly did testify that this configuration could be accomplished without retrogression. However, the inquiry does not end there because the benchmark district was a majority black district. CP 905, which was discussed extensively at trial, does not attain majority BVAP status in District 20. There was no testimony at trial about District 20 and whether it met the Gingles preconditions such that it was protected under the vote dilution provisions of Section 2 of the VRA. Because District 20 was a majority black district in the benchmark, I am reluctant to invalidate the Legislature’s plan absent a showing that more tier-two compliant districts could be drawn while not violating either tier-one requirement regarding racial minority protection. See Apportionment I, 83 So.3d 597, 641 (“If an alternative plan can achieve the same constitutional objectives that prevent vote dilution and retrogression ... without subordinating one standard to another demonstrates that it was not necessary for the Legislature to subordinate a standard in its plan”).
Plaintiffs did produce a couple of draft iterations that achieved majority black status for District 20.[16] However, after visually examining these districts I don’t find sufficient tier-two improvements to justify invalidating the Legislature’s product.[17] These districts have a more irregular boundary in Hendry County, compared to the enacted plan. Additionally, the stacked configuration of Districts 21 and 22 causes both districts to be deeply invaded by tentacles reaching from District 20. In enacted plan 9047, District 21 has no such appendage invading it and is quite visually compact. Furthermore, these iterations cause District 23 to become more visually non-compact, creating two distinct areas, joined by a narrower section.
Plaintiffs have not met their burden of showing unnecessary deviation from tier-two requirements given the various tradeoffs required to draw compact districts in the region as a whole. Nor have they shown that improper intent led to the adoption of Districts 21 and 22. My “duty ‘is not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.’ ” Apportionment I, 83 So.3d at 608 (quoting In re Apportionment Law-1992, 597 So.2d at 285).
Districts 25, 26, & 27
Plaintiffs contend that these districts are invalid because the Legislature unnecessarily split Hendry County between two districts and unnecessarily split the city of Homestead. They also contend that the configuration was done to benefit the Republican Party.
Plaintiffs have not proved invalidity. A regional view of South Florida shows that any tier-two differences between the enacted map and Romo Plaintiffs’ maps are de minimis. Indeed the enacted plan splits the same number of counties, while splitting one less city. Were I to invalidate the enacted plan based on the objective tier-two evidence before me, I would be selecting a plan I found subjectively better rather than determining if Plaintiffs have proved the enacted plan invalid. Id. Nor do I find based on the totality of the evidence that this configuration was based on unlawful partisan intent. Moreover, I *448 credit the testimony of Professor Moreno that Romo A & B could have a retrogressive effect on the Hispanic majority dis-^ric1:s in Florida,

South Florida Regional Compactness Chart

[[Image here]]
The South Florida Regional Compactness Chart contains compactness scores for all districts included in Palm Beach, Broward, Miami-Dade, and Monroe Counties.

South Florida Regional County and City Split Chart

[[Image here]]
This table uses the same 9 districts included in the South Florida Regional Compactness Table.[18]
*449 CONCLUSION
As I find the Legislature’s remaining affirmative defenses to be without merit, I find the Congressional Redistricting plan adopted by the Legislature to be constitutionally invalid. Specifically, Districts 5 and 10 were drawn in contravention of Article III Section 20 of the Florida Constitution. They will need to be withdrawn, as will any other districts affected thereby. All additional challenges to the plan are rejected. Jurisdiction is reserved to consider any pending or post-judgment motions, and to enter such further orders as may be necessary to effectuate this judgment or to otherwise fashion an appropriate equitable remedy.
DONE AND ORDERED in Chambers at Tallahassee, Leon County, Florida, this 10th day of July, 2014.
/s/ Terry P. Lewis TERRY P. LEWIS Circuit Judge
Copies to:
All Counsel of Record

. The contiguity requirement is not at issue in this case.

. The equal population requirement is not at issue in this case.

. Hereafter Apportionment I.

.As a practical matter, it may make little difference as most of the material facts are not in dispute. Rather, the parties differ as to what inferences and legal conclusions may be properly drawn from those facts. Nor do I interpret Apportionment I as significantly reducing the burden on the Plaintiffs to demonstrate the lack of compliance with constitutional requirements. It remains a high burden.

. This is consistent with the approach taken by the Court in Apportionment I. The Court invalidated the entire Senate plan but gave specific instructions as to which districts required corrective action. Id. at 684-686.

. The 1st DCA has withdrawn its order reversing my ruling and passed the matter to the Supreme Court. Members of the original panel have set forth in their dissents their reasons for the initial reversal order which I hope to address here.

. I did not find that a trade secret privilege applied.

. "Anyway, it is utterly impossible to discern what the Members of Congress intended except to the extent that intent is manifested in the only remnant of 'history' that bears the unanimous endorsement of the majority in each House: the text of the enrolled bill that became law.” Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 302, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (Scalia, J., concurring).

. Apportionment TV

. Although one of this group took umbrage at the term operative, another self-described himself as such. I will use the terms interchangeably to refer to the same group.

. Demographic, election, and compactness data are derived from Joint Exhibit 1, unless *443 otherwise stated.

. Then Chairman Weatherford

. The increased Republican performance is admittedly marginal, particularly when comparing enacted CD 7 with the analogue district in Senate map 9014. However, close political races are almost always won or lost on the margins.

. It is true that CD 9 in plan 9043 did not keep Osceola County whole. The goal of keeping cities and counties whole is laudable and required where "feasible.” Compactness on the other hand has no such modifier in its constitutional prescription, "suggesting that in balancing this criterion with compactness, more flexibility is permitted.” Id. at 636.

. The Romo Plaintiffs' proposed map adopts the same general configuration as the Legislature’s enacted map.

. CP 909; CP913.

.Plaintiffs did not provide compactness scores for these districts, so my analysis is limited to the ocular test.

. The specific counties and cities split are as follows:
[[Image here]]
*449 Lake Worth-20, 22 Lantana-20, 22 Margate-20, 21 Miami-24, 27 Miramar-24, 25 Oakland Park-20, 22 Pembroke Pines-23, 24, 25 Plantation-20, 22, 23 Pompano Beach-20, 21, 22 Riviera Beach-18, 20, 22 Royal Palm Beach-18, 20, 21 Sunrise-20, 22, 23 West Palm Beach-18, 20, 22 Margate-20, 21 Miami-24, 27 Miramar-20, 24 North Miami-23, 24 Oakland Park-20, 22 Pembroke Pines-23, 24 Plantation-20, 22 Pompano Beach-20, 21, 22 Port St. Lucie-8, 18 Riviera Beach-18, 20 North Miami Beach-23, 24 Sunrise-20, 22, 23 Tamarac-20, 21 West Palm Beach-18, 20